Nathan McDANIEL, Jr., Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2009–SC–000443–MR.

Supreme Court of Kentucky.

June 16, 2011.

Linda Roberts Horsman, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Perry Thomas Ryan, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice SCOTT.

This is another case where we must reverse due to a trial court's reluctance to strike a juror for cause, necessitating the loss of two of Appellant's peremptory strikes. Equivocation, on such an essential issue as impartiality is simply not sustainable. *Paulley v. Commonwealth*, 323 S.W.3d 715, 721 (Ky.2010) (finding error where "[t]he last word on this crucial subject was the juror's honest-seeming expression of doubt about her ability to be fair and impartial."); *See also Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky. 2008).

Appellant, Nathan McDaniel, Jr., was convicted of murder arising from the beating death of Gerald Sizemore. It was uncontroverted at trial that a fight broke out at the home of Johnny Sizemore in the late hours of August 18, 2007. Gerald, who is not related to Johnny, was at Johnny's home drinking, along with Eugene Sizemore, Johnny's brother. According to Eugene, he eventually passed out on Johnny's couch after hours of drinking and ingesting prescription drugs. He awoke some time later to find Gerald on top of Johnny, beating him.

Eugene, who was physically frail due to a recent surgical procedure, ran to his mother's nearby home for assistance. He awoke Michael Sizemore, his nephew, and Appellant, his brother-in-law, both of whom were staying the night at Eugene's mother's home. The three returned to Johnny's house to find that the fight had ended. Gerald was standing on the porch. Eugene testified that Appellant, without provocation, tackled Gerald and dragged him off the porch. Johnny, Michael, and Appellant continued to beat Gerald with their fists, a stick, and a metal pipe. At trial, Eugene testified that Appellant hit Gerald in the head with the metal pipe,

though in a prior statement to police he identified Michael as the person inflicting that blow. Johnny, in a recorded statement to police, admitted striking Gerald with a glass ashtray and corroborated Eugene's statement that Michael and Appellant relentlessly beat Gerald, even after he was lying on the ground.

Eugene eventually convinced the men to stop the beating and helped Gerald into his car. As Gerald drove away, he threatened the men, which prompted Appellant to use the metal pipe to knock a hole in the car window. Gerald drove home, in the process hitting several utility poles and a neighbor's car. When he arrived home, his adult children did not recognize him because he was so badly beaten. Police were called and Gerald was eventually airlifted to UK Medical Center. Physicians found a subdural hematoma and a tearing of brain tissue due to a serious head injury. Gerald was pronounced brain dead and later removed from life support. He died on August 19, 2007.

Police investigation of the fight eventually led to the indictment of Johnny Sizemore, Eugene Sizemore, Michael Sizemore, and Appellant on charges of murder and complicity to commit murder. Eugene entered into a plea agreement in exchange for his testimony against Appellant. Johnny and Michael were tried and convicted of murder. *See John Sizemore v. Commonwealth*, No. 2008–SC–000562–MR, 2009 WL 4251685 (Ky. Nov. 25, 2009). Appellant was similarly tried and convicted of murder and the trial court imposed a sentence of imprisonment for a term of thirty years. From this conviction, he appeals as a matter of right. Ky. Const. § 110(2)(b).

## Jury Selection

■ Appellant first argues that the trial court erred in failing to strike two jurors for cause. The issue is properly preserved for appellate review by defense counsel's motions to strike.[1] Ultimately, defense counsel struck the two jurors using peremptory challenges. Finding error, we reverse.

■ Kentucky law holds that a trial court's decision on whether to strike a juror for cause rests in the sound discretion of the trial court. *Adkins v. Commonwealth*, 96 S.W.3d 779 (Ky.2003); *Pendleton v. Commonwealth*, 83 S.W.3d 522 (Ky.2002). In making such a determination, the court must weigh the probability of bias or prejudice based on the entirety of the juror's responses and demeanor. *Shane*, 243 S.W.3d at 338. Where the trial court determines that a juror cannot be impartial, RCr 9.36 requires a judge to excuse that juror. RCr 9.36 is mandatory, and provides no room for a trial court to seat a juror who demonstrates his or her inability to be fair.[2] Generally, the impartiality of a juror manifests itself as a state of mind, and not simply through the juror's responses to questioning, although that possibility certainly exists. *United States v. Wood*, 299 U.S. 123, 57 S.Ct. 177, 81 L.Ed. 78 (1936); *Pennington v. Commonwealth*, 316 S.W.2d 221 (Ky.1958). Indeed, a juror may indicate that he or she can be impartial, but may demonstrate a

---

1. Here, the defense not only exercised all its peremptory strikes, two of which struck jurors S.W. and A.W., but also informed the court, consistent with the procedure announced in *Gabbard v. Commonwealth*, 297 S.W.3d 844, 854 (Ky.2009), of the other jurors it would have liked to remove had it not had to use the strikes on S.W. and A.W.

2. RCr 9.36(1) provides in pertinent part: "When there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror *shall* be excused as not qualified." (emphasis added).

state of mind to disprove that statement "by subsequent comments or demeanor so substantially at odds that it is obvious the [trial court] has abused [its] discretion in deciding the juror is unbiased." *Shane,* 243 S.W.3d 336, 338. In contrast, an individual may flatly and blatantly demonstrate his inability to be impartial and fair, and "no magic question" can rehabilitate his impartial state of mind. *Id.*

In *Shane,* we held that the failure to strike a clearly biased juror for cause, necessitating the use of a peremptory strike to ensure an unbiased jury, is the denial of a substantial right. 243 S.W.3d at 340. There, we held that a trial court abuses its discretion when it seats a juror who "indicated a probability that he could not enter the trial giving both sides a level playing field." *Id.* at 338. Likewise, in *Paulley,* we again found reversible error where a trial court seated a juror who was equivocal with regard to her ability to be fair and impartial. 323 S.W.3d 715, 721. In that case, we noted:

> [F]ar more troubling is the fact that prospective juror ... was unable to disclaim any bias.... In fact, she stated she *might not* be able to put out of her mind the fact that her son was a victim of an armed robbery. When asked directly whether she could be fair and impartial, the juror stated *she was not sure.*
>
> . . . .
>
> The last word on this crucial subject was the juror's honest-seeming expression of doubt about her ability to be fair and impartial.

*Id.* (emphasis added). With these principles in mind, we turn to the case at bar.

On voir dire, juror S.W. informed counsel and the court that she had worked with the Gerald's wife, Bobbie, at the Clay County Board of Education. When asked by the trial court whether this would make her tend to favor one side over the other, she replied it was "hard to say." Counsel for Appellant pointed out that Manchester is a small town and that S.W. likely knew about the case since Bobbie had also been charged that night.[3] Although she stated that she had not yet formed an opinion about the case, she acknowledged she knew about it from the paper "and stuff." Thus, S.W. clearly had knowledge about the crime and the people involved and her manner made it clear that she was very uncomfortable with the notion of serving on this jury. When later asked whether she would base her verdict only on the evidence shown at trial, she answered, "I guess."

Juror A.W. acknowledged having worked years ago with the decedent, who had retired from the Clay County Board of Education. When asked if this relationship might affect his deliberations and verdict, he replied it was "hard to say." He acknowledged, however, that the victim was "a good fellow to work with" who "acted a fool a lot." He also indicated that he was a deacon of the church and this would also affect his deliberations, as he had problems "sitting in judgment" of others. In a particularly telling exchange, A.W. was asked and answered:

Defense Counsel: And my concern, representing Mr. McDaniel, and this is a man you said you worked with?

[A.W.]: Yes, yes.

---

3. According to the Commonwealth's brief, Bobbie Sizemore was indicted for solicitation for Gerald's murder. This charge was dismissed without prejudice on September 8, 2009, several months after Appellant's conviction. Yet, during deliberations, the jury sent a note to the court, inquiring: "can we ask what [Mrs. Sizemore] is charged with?" The court, however, declined to answer.

Defense Counsel: And you said you worked with him. You sound like you liked him.

[A.W.]: Yeah, yeah.

Defense Counsel: And I'm just asking, is that something where we kind of start off with a disadvantage?

[A.W.]: Could. Could be, you know. I want to be honest about it, you know.

Defense Counsel: I understand. That's why Mr. Gregory's here. Sometimes jury service means that you shouldn't, if you have that type of feeling, I understand that.

[A.W.]: Yeah, yeah.

Defense Counsel: Judge, with all due respect to [A.W.], I'm going to move to strike him for cause because I understand working with a fellow, and liking a fellow, that long, and having this type of situation, it's very emotional, and I'm afraid that it will bring back emotions in him and that's just human nature.

[A.W.]: Yeah, yeah.

Defense Counsel: So I move to strike him [for cause].

Counsel for Appellant also moved to strike S.W. for cause. Both strikes, however, were denied.

Thus, the defense was forced to use one of its peremptory strikes to strike S.W., who had worked with the *victim's wife*, and another to strike A.W. who had worked with the *victim*, and liked him— neither of whom could say *unequivocally* that they could be fair and impartial in their deliberations; just "I guess" and "it's hard to say," and as to A.W., when asked if the defense was starting off at a disadvantage, "[c]ould be, you know. I want to be honest about it, you know." Given the equivocal responses provided by A.W. and S.W. in this case, we hold that the trial court abused its discretion when it overruled Appellant's motion to strike them for cause.

The failure to strike a clearly biased juror for cause, necessitating the use of a peremptory strike to ensure an unbiased jury, is the denial of a substantial right, and we hold that a trial court abuses its discretion when it seats a juror who is truly equivocal with regard to his or her ability to render an impartial judgment. Under *Shane* and *Paulley* equivocation is simply not good enough. *Shane*, 243 S.W.3d at 339; *Paulley*, 323 S.W.3d 715. The substantial right recognized in those case provides no room for a trial court to seat a juror who is not sure whether he can provide both sides with a level playing field. A juror's statements and demeanor must support the trial court's decision to seat him, given the totality of the circumstances. To do less would give defendant's a substantial right "with one hand and take [it] away with the other." *Shane*, 243 S.W.3d at 339. Therefore, because these two jurors could not state that they possessed the ability to be fair and impartial we hold that the selection process was not fair in this case. We reiterate that "a trial is not fair if only parts of it can be called fair." *Id.*

The underlying conviction in this case are reversed and this matter is remanded to the Clay Circuit Court for further proceedings consistent with this opinion.

Having concluded that Appellant is entitled to a new trial, we address the following issues given the likeliness of their recurrence on remand.

### KRE 404(b) evidence

Appellant next claims that the trial court erred in admitting evidence in violation of KRE 404(b). The Commonwealth introduced a photograph of a bleach bottle that investigators found next to the driveway at Johnny's home. Appellant

claims that the photograph of the bleach bottle was irrelevant and unduly prejudicial, as there was no testimony that he had used the bleach. Over defense objection, the trial court allowed the photograph with instructions to the Commonwealth to clarify that Appellant had not used the bleach.

During general testimony regarding the scene of the crime as investigating officers found it, Officer Marion Spurlock testified that they smelled bleach as they approached the home. The photograph depicting a bleach bottle sitting near the driveway was introduced. Later in the trial, Eugene Sizemore testified that Michael had used the bleach to clean up blood, and that Appellant was not present when this occurred. The Commonwealth argued, in its closing, that bleach was used by Johnny and Michael in an effort to conceal a crime.

KRE 404(b) prohibits evidence of other crimes, wrongs, or acts "to prove the character of a person in order to show action in conformity therewith." We do not believe the photograph depicting the bleach bottle constitutes prohibited 404(b) evidence because no testimony was provided linking Appellant to the bleach bottle or the clean-up of the crime scene. In fact, the only specific testimony came from Eugene, who clarified that Appellant was not present when the bleach was used. Thus, the bleach bottle or the clean-up of the crime scene cannot be fairly construed as a prior bad act on the part of Appellant. *See Commonwealth v. Mitchell*, 165 S.W.3d 129, 134 (Ky.2005) (officer's testimony that he had received other "complaints" about defendant did not constitute KRE 404(b) evidence as the testimony was not descriptive enough to be construed as a prior bad act on the part of defendant).

Furthermore, we do not believe the evidence was so unduly prejudicial to warrant exclusion. Appellant was charged with both murder and complicity to murder. Thus, the intent of Appellant's co-conspirators was an element of the offense. KRS 502.020. The photograph and testimony regarding the bleach were relevant to and probative of Johnny's motive. *See Welborn v. Commonwealth*, 157 S.W.3d 608, 615 (Ky.2005) ("Flight and attempt at concealment are circumstantial evidence of guilt because they suggest a guilty state of mind."). Given the uncontroverted testimony that Appellant did not use the bleach or participate in any clean-up of the crime scene, he was not unduly prejudiced by introduction of this photograph. The trial court did not abuse its discretion. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

*Hearsay*

■ Appellant complains that the trial court improperly permitted Chief Jeff Culver to provide hearsay testimony. During direct examination, Chief Culver testified that he "learned by interviewing Eugene Sizemore that [Appellant] had been present at Johnny Sizemore's home that night." Later, the Commonwealth asked Chief Culver if he had learned "from this statement with Eugene, that [Appellant] was present when all this went on and had involvement, but he wasn't out there when you all went out there with the search warrant"? Chief Culver responded in the affirmative to this question, adding that he "found out from Eugene what [Appellant]'s involvement was," though he did not elaborate. The trial court overruled defense counsel's repeated objections to this line of questioning.

■ "[A] police officer may testify about information furnished to him only where it tends to explain the action that was taken by the police officer as a result of this information *and* the taking of that action is an issue in the case." *Sanborn v. Commonwealth*, 754 S.W.2d 534, 541 (Ky.

1988) (emphasis in original) (overruled on other grounds by *Hudson v. Commonwealth*, 202 S.W.3d 17, 22 (Ky.2006)). Here, Chief Culver's testimony explained why Appellant was questioned; however, the propriety of the officers' actions was not in issue. As such, in this regard, the admission of these statements was error.

### Autopsy Photographs

 Appellant asserts that he was prejudiced by the admission of multiple autopsy photographs of the victim. None of the autopsy photographs have been included in the record before this Court. We, therefore, are unable to assess the prejudicial value of the photographs. It is Appellant's duty to designate the contents of the record on appeal. *Commonwealth v. Thompson*, 697 S.W.2d 143, 144 (Ky. 1985). "It has long been held that, when the complete record is not before the appellate court, that court must assume that the omitted record supports the decision of the trial court." *Id.* at 145.

### Cross-examination of Eric Schott

 Appellant claims that he was improperly precluded from cross-examining Eric Schott about a prior robbery conviction. Schott, who was incarcerated with Appellant while he was awaiting trial, testified that he overheard Appellant make several statements regarding this case.

On cross examination, defense counsel elicited from Schott that, at the time of trial, he had pleaded guilty to one count of robbery in the second degree. Schott admitted that he would not have testified for the Commonwealth in Appellant's trial without the plea agreement, which had been completed that morning. Defense counsel attempted to cross-examine Schott as to the nature of the robbery which he committed in Clay County. The trial court restricted cross-examination to the fact of

Schott's conviction and disallowed questions pertaining to the specific circumstances of the offense. On avowal, Schott testified that he and an accomplice robbed an elderly couple in their Clay County home.

Appellant now argues that defense counsel should have been permitted to elicit the circumstances of his robbery conviction. Kentucky's Rules of Evidence are clear that this type of cross-examination is not permitted. KRE 609(a). Schott admitted on direct examination that he is a convicted felon and even identified the most recent conviction as robbery. Accordingly, defense counsel was not entitled to delve into the circumstances of the crime. *See Blair v. Commonwealth*, 144 S.W.3d 801, 808 (Ky.2004) (where the witness admits the existence of the felony conviction, "[KRE 609] permits impeachment only by evidence of a prior felony conviction and prohibits disclosure of the nature of the conviction....").

Moreover, a review of the record reveals that cross-examination was thorough and vigorous. Defense counsel relentlessly attacked Schott's credibility based on his plea agreement with the Commonwealth, his numerous felony convictions in Kentucky and Indiana, and his repeated parole violations. There was no abuse of discretion by the trial court. *Davenport v. Commonwealth*, 177 S.W.3d 763, 771 (Ky.2005) (trial court enjoys broad discretion in regulating cross-examination).

### Prosecutorial Misconduct

 Appellant complains that the Commonwealth made improper comments during its opening and closing arguments. The Commonwealth opined that the case involved "the worst beating ever in Clay County" during its opening statement. In closing, the Commonwealth referred to the plea agreement offered to Eugene Sizemore, commenting that "sometimes you

have to make a deal with a demon to get the devil." Defense counsel objected to both statements.

■ We do not find the comments improper. *Hannah v. Commonwealth*, 306 S.W.3d 509, 518 (Ky.2010). Attorneys are afforded great leeway in opening and closing arguments. *Slaughter v. Commonwealth*, 744 S.W.2d 407, 412 (Ky.1987). These bounds were not exceeded by the Commonwealth's statement of opinion that this was "the worst beating ever in Clay County." *See Tamme v. Commonwealth*, 973 S.W.2d 13, 39 (Ky.1998) (no error in Commonwealth's statement during its closing argument that this was "worst imaginable crime"). Likewise, it was permissible for the Commonwealth to refer to the plea agreement with Eugene Sizemore, particularly in light of defense counsel's argument that Eugene's credibility was in question due to the agreement. This oblique reference to Appellant was not improper. *See Slaughter*, 744 S.W.2d 407. (prosecutor's comment that defendant was a "bit of evil" not improper). There was no error.

### Cumulative Error

Having reversed on other grounds, we find it unnecessary to address Appellant's cumulative error argument.

### Conclusion

For the foregoing reasons, the judgment of the Clay Circuit Court is reversed, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

All sitting. MINTON, C.J.; ABRAMSON, NOBLE, SCHRODER, and VENTERS, JJ., concur. CUNNINGHAM, J., dissents by separate opinion.

CUNNINGHAM, J., dissenting:

Respectfully, I must dissent because I do not believe the trial court abused its discretion in refusing to strike Jurors S.W. and A.W. for cause.

In *Shane v. Commonwealth*, 243 S.W.3d 336 (Ky.2007), this Court leveled the playing field by not forcing the defendant to give up a peremptory strike to get an ineligible juror removed from the panel. However, in doing so, we enhanced the consequences of a court failing to properly excuse a juror for cause. Therefore, we should more closely scrutinize juror questioning so as to be especially careful that we do not reverse serious criminal cases, such as this one, because of imperfect answers given by prospective jurors.

Because jurors are often unable to precisely articulate their answers to confusing and hypothetical voir dire questions, we have repeatedly stressed that a trial judge must assess the *totality* of a prospective juror's responses. *Id.* at 338. Just as there are no "magic" words to rehabilitate a juror, there should be no "magic" words that automatically disqualify a juror. Along with the actual content of the responses, a juror's demeanor, credibility, and sincerity should be taken into account. *Adkins v. Commonwealth*, 96 S.W.3d 779 (Ky.2003).

For this reason, we continually observe that the trial court, being physically present to observe the juror, is in the best position to assess that juror's qualifications. Having set forth these standards for our trial courts, I believe this Court is obliged to likewise look to the totality of the juror's responses and demeanor. In this case, the majority has disregarded these directives and based its decision solely on extracted responses and without any consideration of the demeanor or affect of Jurors S.W. and A.W.

In reviewing the video record of Juror S.W.'s responses, it is clear that her sincerity and credibility were immediately questioned. She first informed the court that she couldn't be fair because some years earlier she had worked with "the girl," referring to Gerald Sizemore's wife, Bobbie. In fact, S.W. could not even remember Bobbie's name and had to ask the trial court to remind her. She then continued that she couldn't be fair because she knew "all about the case." When pressed, she admitted that this personal knowledge was gleaned solely from articles in the newspaper. The majority is correct that S.W. gave equivocal answers, such as, "I guess," and "It's hard to say," when asked if she could be fair and impartial in her deliberations. However, it is equally clear that S.W. had no articulable basis for her supposed bias and never identified any concrete reason for an inability to be impartial.

More compelling than S.W.'s responses is her demeanor, which is plainly evident, even on the video record. S.W. is smiling and, at times, chuckles while giving her responses to the trial court. When pressed by the court about her stated inability to be impartial, S.W. has no concrete response and simply smiles. Her sincerity was obviously doubted by the trial judge, who finally told her that he could "never seat a jury" if he had to rely only on people who actually wanted to be there.

We must not allow prospective jurors to manipulate the system by giving evasive and insincere answers in an attempt to evade their duty to serve. Trial judges must be given great latitude in dealing with such people. I see no abuse of discretion with respect to Juror S.W. Neither her relationship with Bobbie Sizemore nor her knowledge of the case was sufficient to automatically disqualify her. *See Sholler v. Commonwealth*, 969 S.W.2d 706, 709 (Ky.

1998); *Foley v. Commonwealth*, 953 S.W.2d 924, 932 (Ky.1997). When considered in their totality, S.W.'s demeanor and responses indicate an unwillingness—not an inability—to serve on the jury. The video record clearly supports this conclusion and, therefore, it cannot be said that the trial court abused its discretion.

The voir dire examination of Juror A.W. presents a similar situation. A.W. initially told the trial court that he was unable to serve because his back and neck were bothered by prolonged sitting. After being assured that periodic breaks would be provided, A.W. then revealed that he used to work with Gerald Sizemore for a period of three years about "fifteen or more" years ago. A.W. was pressed on this issue and gave inconsistent responses about his ability to put aside his personal acquaintance with the victim. Finally, A.W. interjected that, as a deacon in his church, he could not "judge anybody." Again, when questioned further, A.W. provided inconsistent responses. Replying to leading questions, he stated both that he believed "it's wrong" to sit in judgment of others, and that he "probably" could base a decision on the evidence alone and "do what's right."

The record very fairly supports the conclusion that A.W. was hesitant—but not unable—to serve as a juror. While, like S.W., this juror at times gave equivocal responses, he also provided assurance that he could be fair and impartial. "The trial judge properly may chose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading." *Mabe v. Commonwealth*, 884 S.W.2d 668, 671 (Ky.1994) (quoting *Patton v. Yount*, 467 U.S. 1025, 1038–39, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)). We also cannot expect the trial court to ignore the fact that a juror provides reason after reason for disqualifica-

tion. Under such circumstance, it is reasonable for the trial court to doubt the juror's sincerity.

I fear that we have recently diverged from a practical, real-world consideration of voir dire decisions and have adopted a hyper-technical approach that relies almost solely on "magic" words which automatically disqualify a juror. Here, the trial court assessed the *totality* of the responses of Jurors S.W. and A.W. and drew fair conclusions therefrom. Our review is for abuse of discretion and none occurred here. Therefore, I respectfully dissent.